IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville December 19, 2023

**STATE OF TENNESSEE v. JUANYAI WALLS**

**Appeal from the Criminal Court for Shelby County**
**Nos. C18-09507, 18-06688      Jennifer Johnson Mitchell, Judge**

_____

**No. W2022-01379-CCA-R3-CD**

_____

A Shelby County jury convicted the Defendant, Juanyai Walls, of two counts of first degree premeditated murder, two counts of felony murder, and two counts of especially aggravated robbery. The trial court sentenced the Defendant to serve an effective sentence of life plus fifteen years. On appeal, the Defendant argues that the evidence is legally insufficient to support his convictions. He also asserts that the trial court erred by (1) allowing the introduction of written notes from the Defendant to his co-defendants while in custody; and (2) imposing consecutive sentences. Upon our review, we respectfully affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

W. Price Rudolph (on appeal) and Lauren Pasley (at trial), Memphis, Tennessee, for the appellant, Juanyai Walls.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and William J. Cranford and Paige Munn, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

### A.     THE MURDERS OF JEREME JONES AND DEVONTE TAYLOR

This case arose out of the shooting deaths of Jereme Jones and Devonte Taylor on February 2, 2018.  That afternoon, Jereme Jones told his girlfriend that he had bought three guns "off the streets," one black handgun and two rifles.  Mr. Jones put the guns in his car, an orange Chevy Cobalt, with the handgun in the front seat and the rifles in the trunk.

That afternoon, Mr. Jones posted a "story" on social media showing the guns.  The Defendant, whose nickname was "Yai Yoo," responded to the post, telling Mr. Jones that he should sell the guns.  The two messaged back and forth about the prices, and the Defendant said he would pay "4," meaning $400.  Mr. Jones asked the Defendant to contact him through FaceTime, and the message was marked as "Seen."

Later that night, Mr. Jones met up with Devonte Taylor, and they called the Defendant to buy marijuana.  They agreed to meet at a McDonald's to make the purchase. At some point, the Defendant, who was a member of the Piru Blood gang, developed a plan with other gang members to rob Mr. Jones and Mr. Taylor of the weapons the Defendant knew were in Mr. Jones's car.

Once Mr. Jones and Mr. Taylor arrived at the McDonald's, the Defendant gave them marijuana and invited them to a party.  After the party ended, the Defendant and an associate rode to Fletcher Creek Park with Mr. Jones and Mr. Taylor in Mr. Jones's car. The Defendant sent a message to two other associates, Jai Dillard and Claude Pagou, to let them know where he was going.  Later, the Defendant sent another message to Mr. Dillard stating, "Come get us.  We did it."  When Mr. Dillard asked what they did, the Defendant replied that they had shot and killed the victims.

Mr. Dillard then drove to the park to meet the Defendant, though Mr. Pagou, who was with Mr. Dillard initially, did not go with him.  When Mr. Dillard arrived, the Defendant had two handguns, and his associate had a rifle.  The Defendant stated that one of the guns belonged to the victims. Recounting the events, the Defendant told Mr. Dillard that they tried to lure the victims out of the car, but they would not get out because it was too cold.  So, they instead got in the car with the victims and "smoked" with them.  The Defendant then typed on his cell phone, "Let's shoot and kill 'em," and passed the phone to his associate.  They then shot both victims.

2

On their way to leave the park, Mr. Pagou rejoined the group and got into the car. Mr. Dillard later stopped so that the Defendant could dispose of one of the victim's cell phones. The Defendant threw the cell phone in the Houston Levee Road area near where he lived. According to the cell phone tracker, this was the last known location of Mr. Jones's cell phone.

## B.  LAW ENFORCEMENT INVESTIGATION

The following day, law enforcement officers arrived at Fletcher Creek Park after receiving a 911 call. They found Mr. Jones's orange Chevy Cobalt idling with the engine still running. They also found multiple spent shell casings inside and outside of the car and a spent bullet between the driver's seat and the door. Additionally, the trunk release button inside the car had been pulled down and had blood on it, indicating that someone had removed items from the trunk. The police searched the trunk, and although they found no handguns, they found a handgun case and two handgun magazines loaded with .40 caliber rounds.

Later that month, the police questioned Mr. Dillard. He initially denied knowing anything about the murders because he did not want to be labeled a "snitch." However, he later agreed to testify at the Defendant's trial. Mr. Dillard revealed that the Defendant had spoken to him about the shooting a few weeks prior and had told Mr. Dillard details about how the murders occurred. Specifically, the Defendant told Mr. Dillard that he and his accomplice were sitting in the backseat when they shot and killed the victims sitting in the front seats. The Defendant also told Mr. Dillard that he used his nine-millimeter gun to shoot one of the victims.

Special Agent Brock Sain with the Tennessee Bureau of Investigation ("TBI") analyzed bullets, bullet casings, and bullet fragments obtained from the scene and the victims' autopsies. His testing revealed that the casings and bullets had been fired from the same two unknown firearms. Special Agent Sain also concluded that the bullets and bullet fragments were consistent with being fired from a nine-millimeter handgun.

Dr. Katrina Vanpelt, the Medical Examiner at the University of Tennessee Health Science Center, performed the autopsies of Mr. Jones and Mr. Taylor. She observed that Mr. Jones had nine gunshot wounds, and Mr. Taylor had thirteen. Dr. Vanpelt concluded that the wounds were consistent with being shot from behind and that the victim's deaths were attributable to the gunshot wounds.

## C.    TRIAL, SENTENCING, AND APPEAL

A Shelby County grand jury jointly charged the Defendant and his three associates with two counts of first degree premeditated murder, two counts of first degree felony murder, and two counts of especially aggravated robbery. The trial court severed the Defendant's trial from the other co-defendants, and the Defendant's trial started on July 11, 2022.

Following the trial, the jury convicted the Defendant as charged. At the sentencing hearing on August 26, 2022, the State introduced the Defendant's presentence report, including his juvenile record, as evidence. Additionally, the court determined that the Defendant had fifteen unrelated, pending cases before the trial court at the time of sentencing. Each of the victims' mothers gave a victim impact statement. The Defendant presented no proof at the sentencing hearing and declined to make a statement.

With respect to each victim, the trial court merged the felony murder and first degree premeditated murder convictions and imposed two concurrent life sentences. The court also imposed concurrent sentences of fifteen years for each especially aggravated robbery conviction. It aligned the especially aggravated robbery convictions to run consecutively to the first degree murder convictions for a total effective sentence of life plus fifteen years.

The Defendant filed a timely motion for a new trial, which the trial court denied on September 26, 2022. The Defendant filed a timely notice of appeal three days later.

## ANALYSIS

In this appeal, the Defendant first argues that the evidence is legally insufficient to support his convictions. He also asserts that the trial court erred by allowing the introduction of written notes from the Defendant to his co-defendants while in custody. Finally, he contends that the trial court abused its discretion by imposing consecutive sentences. We address each of these issues in turn.

## A.    LEGAL SUFFICIENCY OF THE EVIDENCE

The Defendant first argues that the evidence is legally insufficient to support his convictions for two counts of first degree premeditated murder, two counts of felony murder, and two counts of especially aggravated robbery. He asserts that the State failed to prove that he committed these crimes because the only evidence was the testimony of his accomplices, which he claims is uncorroborated. In response, the State argues that

4

other evidence sufficiently corroborated the accomplices' testimony and that the proof is legally sufficient to support the Defendant's convictions. We agree with the State.

## 1. Standard of Appellate Review

"The standard for appellate review of a claim challenging the sufficiency of the State's evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review is "highly deferential" in favor of the jury's verdict. *See State v. Lyons*, 669 S.W.3d 775, 791 (Tenn. 2023). Indeed, this standard requires us to resolve all conflicts in favor of the State's theory and to view the credited testimony in a light most favorable to the State. *State v. McKinney*, 669 S.W.3d 753, 772 (Tenn. 2023). To that end, "[w]e do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (citations omitted). "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (internal quotation marks and citation omitted).

## 2. First Degree Premeditated Murder

As charged in this case, first degree premeditated murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2018). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). Our General Assembly has defined "premeditation" as being

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (2018) (subsequently redesignated). Like any other element of an offense, "the State must prove premeditation beyond a reasonable doubt." *Miller*, 638 S.W.3d at 159.

5

The question of "[w]hether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing." *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Our supreme court has observed that a jury may consider the following non-exclusive factors to infer premeditation:

> (1) use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) declarations by the defendant of an intent to kill; (4) evidence of procurement of a weapon; (5) preparations before the killing for concealment of the crime; (6) calmness immediately after the killing; (7) a lack of provocation on the victim's part; and (8) a defendant's failure to render aid to a victim. Proof that establishes a motive for the killing is also a factor a jury may consider.

*McKinney*, 669 S.W.3d at 773 (citations omitted). "[I]n determining the existence of premeditation, the trier of fact 'may not engage in speculation.'" *State v. Reynolds*, 635 S.W.3d 893, 918 (Tenn. 2021) (quoting *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005)). That said, "Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence" because "premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." *Davidson*, 121 S.W.3d at 614-15.

In addition, a person may be held criminally responsible as a party to an offense under Tennessee law "if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401. Our supreme court has recognized that "criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). As charged in this case, a person may be criminally responsible for an offense committed by another person, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Under this particular theory of criminal responsibility, "the evidence must establish that a defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted or assisted its commission." *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (citations omitted). "Thus, the State must prove both that the defendant's intent and his or her conduct come within the language of the statute itself." *State v. Jenkins*, No. M2022-00693-CCA-R3-CD, 2023 WL 5813706, at *5-6 (Tenn. Crim. App. Sept. 8, 2023), *no perm. app. filed.*

The record contains sufficient evidence from which a reasonable juror could conclude that the Defendant acted with intent and premeditation in killing Jereme Jones

and Devonte Taylor.  Viewing the evidence in a light most favorable to the State, the Defendant began his long game by messaging Mr. Jones as soon as he learned that Mr. Jones had firearms, as shown in the messages introduced at trial.  The Defendant developed a plan to steal the weapons from Mr. Jones, and he met Mr. Jones and Mr. Taylor later in the day.  After they all attended a party, the Defendant and an associate got into the victim's vehicle and rode to Fletcher Creek Park where the Defendant could carry out his plan.

On the way, the Defendant coordinated the logistics of the robbery, instructing Mr. Dillard to wait for him to complete the crime.  While at the park, the Defendant typed out a message to his associate on his phone, "[l]et's shoot and kill 'em," thereby demonstrating an intent to kill formed after the exercise of reflection and judgment.  The Defendant and his associate shot the victims multiple times from behind and without provocation.  The Defendant left the scene with Mr. Dillard and did not render aid to either victim.  Under the deferential standard of review, we conclude that a reasonable juror could have found beyond a reasonable doubt that the Defendant killed each victim with intent and premeditation or was criminally responsible for their deaths.  As such, the proof is legally sufficient to support the Defendant's convictions for the first degree, premeditated murders of Mr. Jones and Mr. Taylor.

### 3.      First Degree Felony Murder & Especially Aggravated Robbery

The Defendant next challenges his convictions for felony murder and especially aggravated robbery.  First degree felony murder is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]"  Tenn. Code Ann. § 39-13-202(a)(2) (2018).  No culpable mental state is required for a felony murder conviction except the intent to commit the underlying felony, *id.* § 39-13-202(b), and the defendant "must intend to commit the underlying felony at the time the killing occurs[.]"  *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999).  When determining whether the killing occurred during the perpetration of the felony, our supreme court has stated that "consideration of such factors as time, place, and causation is helpful in determining whether a murder was committed 'in the perpetration of' a particular felony."  *Id.* at 106.  Further, "the killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action."  *Id.*

Importantly, our supreme court has held that "in determining whether the evidence is sufficient to support a conviction of first degree murder in the perpetration of theft, a court must determine whether the killing is closely connected to the initial taking of the property in time, place, causation, and continuity of action."  *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000).  This is because "'[t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent

7

from it.'" *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting *Wharton on Homicide*, § 126 (3d ed.) (omission in original)).

To obtain a conviction for especially aggravated robbery, the State must first prove a robbery, or an intentional or knowing theft of property from the person of another by violence or putting the person in fear. Tenn. Code Ann. § 39-13-403(a). The State then must also prove that the robbery was "[a]ccomplished with a deadly weapon" and that "the victim suffer[ed] serious bodily injury." *Id.*; *State v. Henderson*, 531 S.W.3d 687, 691-92 (Tenn. 2017).

In this case, the Defendant and his associates planned to rob the victims and steal the firearms that Mr. Jones had in his car. After attending a party, the Defendant and an associate rode to Fletcher Creek Park in the victim's car. At the park, the Defendant and his associate shot and killed the victims and took the firearms from the trunk of the car. After the killings, the Defendant and his associate were in possession of additional firearms, and the Defendant told Mr. Dillard that he had shot and killed the victims.

Viewing the evidence in a light most favorable to the State, a reasonable juror could find that the Defendant intended to steal the firearms from Mr. Jones, that he did so by using violence, and that he killed Mr. Jones and Mr. Taylor with a deadly weapon. A reasonable juror could also find that the deaths of Mr. Jones and Mr. Taylor occurred during the perpetration of this robbery and that the killings were closely connected to the robbery in time, place, causation, and continuity of action. The Defendant does not challenge any particular element of these crimes, including that of a taking, apart from his argument that the accomplices' testimony was not sufficiently corroborated, which we discuss below. As such, we conclude that the proof is legally sufficient to support the Defendant's convictions for the first degree felony murders of Mr. Jones and Mr. Taylor and the especially aggravated robberies of these victims.

### 4.    Corroboration of Accomplice Testimony

The Defendant's principal attack on the sufficiency of the convicting evidence concerns whether the testimony of the accomplices was corroborated by independent evidence. He asserts that there were no eyewitnesses to the killings, that no DNA or fingerprint evidence placed him at the scene, and that no gun was recovered to link him to the murders. He further argues that the State relied solely on the uncorroborated testimony of two of his accomplices, Mr. Dillard and Mr. Pagou. We again respectfully disagree.

At the time of the Defendant's crimes, it was well-established that "evidence is insufficient to sustain a conviction when the conviction is solely based upon the uncorroborated testimony of one or more accomplices." *State v. Thomas*, __ S.W.3d__,

8

2024 WL 979852 at *10 (Tenn. Mar. 7, 2024) (citing *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (internal quotation marks removed)).[1]  "An accomplice is one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a crime." *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004).  As our supreme court has recently described the accomplice-corroboration rule,

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.  This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.  It is not necessary that the corroboration extend to every part of the accomplice's evidence.  The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*Thomas*, 2024 WL 979852 at *10 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)).

The parties do not dispute that Mr. Dillard and Mr. Pagou qualify as accomplices because they were each indicted for the same homicides charged against the Defendant. *See State v. Jones*, 568 S.W.3d 101, 133 (Tenn. 2019) ("The test for whether a witness qualifies as an accomplice is whether the alleged accomplice could be indicted for the same offense charged against the defendant." (citation and internal quotation marks omitted)). As such, the Defendant may be convicted solely on the testimony of these witnesses if their testimony is each sufficiently corroborated by independent evidence. *See Thomas*, 2024 WL 979852, at *19 (recognizing that "accomplices may not corroborate each other"). As we noted above, this independent corroboration does not need to extend to every part of

---

[1]  Our supreme court has abrogated or abolished the accomplice-corroboration rule for all cases tried after March 18, 2024. *See Thomas*, 2024 WL 979852, at *13 ("[I]n the interest of fairness, we will apply the common law accomplice-corroboration rule to Ms. Turner's case, but the rule will be abolished in its current form going forward and that change shall be applied to all trials commencing after the date of the mandate [issued on March 18, 2024]."). This means that a jury may evaluate the testimony of an accomplice as it does with other witnesses and may "convict upon this testimony alone" if it is "convinced beyond a reasonable doubt that [the accomplice's testimony] is true." *Id.* at *16.  However, for cases tried before March 18, 2024, the law continues to provide that a conviction may not be "solely based upon the uncorroborated testimony of one or more accomplices." *See Collier*, 411 S.W.3d at 894.

Mr. Dillard's and Mr. Pagou's testimony, but it will be sufficient when the evidence "lead[s] to the inferences that a crime has been committed and that the defendant is implicated in the crime." *Jones*, 568 S.W.3d at 134.

In this case, Mr. Dillard testified that the Defendant owned a handgun, and surveillance video introduced at the trial showed the Defendant in possession of a pistol before the murders. Mr. Dillard also testified that the Defendant told him he had been sitting behind the victims in the car when he shot and killed them with his nine-millimeter pistol. TBI Special Agent Sain testified that the bullets and bullet fragments at the scene were consistent with a nine-millimeter gun. And Dr. Katrina Vanpelt testified that both victims had wounds consistent with being shot from behind, and the position of the front seats in the victim's car indicated that someone exited the car from the backseat. Finally, Mr. Dillard testified that the Defendant had one of the victim's phones right after the murders and that he stopped in the Houston Levee Road area so that the Defendant could dispose of the phone. This testimony was corroborated by Mr. Jones's cell phone tracker, which showed the Houston Levee Road area as the last known location of his cell phone. We conclude that Mr. Dillard's testimony was sufficiently corroborated by independent evidence showing the fact of a crime and the Defendant's participation in it.

As for Mr. Pagou's testimony, he testified that he met with the Defendant and the group at a McDonald's on the night of the murders, and this testimony was corroborated by surveillance video from that McDonald's. Mr. Pagou testified that the Defendant wanted to rob the victims because they had weapons, and this testimony was corroborated by messages showing the Defendant communicating with Mr. Jones about the purchase of one of these weapons. Mr. Pagou also testified that the Defendant had a nine-millimeter handgun that night and that he possessed additional firearms after the murders. This testimony was confirmed by surveillance video before the crimes and by evidence that Mr. Jones had purchased additional firearms, including the testimony from Mr. Jones's girlfriend. We conclude that Mr. Pagou's testimony was sufficiently corroborated by independent evidence showing the fact of a crime and the Defendant's participation in it.

Because the separate testimonies of Mr. Dillard and Mr. Pagou were each corroborated by independent evidence, the jury could have convicted the Defendant based on this credited proof alone. As it stands, however, the State's case included overwhelming evidence that the Defendant participated in an intentional double homicide in the perpetration of a robbery. As such, we conclude that the proof is legally sufficient to support each of the Defendant's convictions. The Defendant is not entitled to relief on this basis.

## B.  ADMISSION OF JAIL NOTES

The Defendant next argues that the trial court erred in allowing the introduction of five separate notes the Defendant wrote to his co-defendant while in custody.  Specifically, the Defendant claims that the trial court erred in admitting the notes pursuant to Tennessee Rule of Evidence 404(b) because it failed to find that the Defendant authored the notes by clear and convincing evidence.  He also argues that the danger of unfair prejudice outweighed the probative value of the notes.  For the reasons given below, we respectfully disagree.

### 1.  Background

To provide context for this issue, the trial court conducted a jury out hearing on July 5, 2022, to consider the State's motion to admit five notes that the Defendant wrote to his co-defendant, Mr. Pagou, while they were in custody at the Shelby County jail.  At the hearing, the State presented the testimony of Mr. Dillard, who authenticated the Defendant's handwriting, and Mr. Pagou, who received the notes.

Mr. Dillard testified that he had gone to school with the Defendant since he was fifteen years old.  However, he became familiar with the Defendant's handwriting when the Defendant sent him multiple notes while they were in custody together.  Mr. Dillard was able to identify that these notes were from the Defendant because he and the Defendant were members of the Piru Blood gang and the notes contained specific phrases that gang members used to communicate with each other.

Additionally, Mr. Dillard testified that the Defendant commonly used the nickname "Yai Yoo" and signed the notes he sent to Mr. Dillard that way.  At the hearing, Mr. Dillard looked at several notes sent to Mr. Pagou that were signed with "Yai Yoo."  He identified these notes as being written by the Defendant by recognizing the handwriting and signature.

Mr. Dillard also testified that Mr. Pagou used the nicknames "CeeLow" and "Couple Grand."  Specifically, Mr. Dillard identified "Couple Grand" as Mr. Pagou's "jailhouse name" and said the Defendant would be familiar with that name.  Mr. Dillard said that Mr. Pagou's nickname was in the notes the Defendant sent to Mr. Pagou.  Lastly, Mr. Dillard was able to identify several statements discussing the facts of their case in the notes sent to Mr. Pagou.

For his part, Mr. Pagou testified that he had also attended school with the Defendant and had known him for five to seven years.  Mr. Pagou also recognized several notes he

11

received while in custody at the Shelby County jail and stated that he knew they were from the Defendant.

The State sought to introduce five notes through Mr. Pagou. In the first note, the Defendant instructed Mr. Pagou to do whatever he needed to get "us home" and stated that the case against them was weak except for witness statements. He signed this note, "Love 100 slaughter Yai."

In the second note, the Defendant repeatedly instructed Mr. Pagou to recant his statement. He told Mr. Pagou to say that he was nervous or high when he spoke with law enforcement. This note was addressed to "CeeLow" and was also signed "Love 100 – Yai Yoo."

In the third note, the Defendant again instructed Mr. Pagou to recant his statement. Additionally, he stated, "We go to court in a couple [of] weeks or so, mane I hope you on the business for all of us." This note was addressed to "Couple Grand" and was also signed "Yai."

In the fourth note, the Defendant again instructed Mr. Pagou to recant his statement. The Defendant referred to the other two co-defendants in the case, indicating that he had them under control. This note was addressed to "Couple Grand" but was unsigned.

Finally, in the fifth note, the Defendant instructed Mr. Pagou to write to the Defendant's attorney and let her know that Mr. Pagou was high when he gave his statement and that it was "not true at all."

Mr. Pagou testified that he knew these letters were from the Defendant because several of them were signed by "Yai Yoo." Additionally, the Defendant referred to specific facts of their case, such as the next court date, and discussed the other two co-defendants charged in the case with them.

After the hearing, the trial court found that Mr. Pagou and Mr. Dillard had sufficiently authenticated the notes. Further, the court stated that,

I'm going to allow them to come in for identification purposes. The Court also feels like they are indicative of the [D]efendant's consciousness of guilt. They are very coercive. A couple of them are threatening. So, I'm going to allow that to come in under Mr. Pagou.

When the trial resumed, the court permitted the State to introduce the five notes and publish them to the jury.

## 2. Tennessee Rule of Evidence 404(b)

In this appeal, the Defendant argues that the jail notes were inadmissible under Tennessee Rule of Evidence 404(b). To support his argument, the Defendant alleges that the trial court did not comply with the procedural requirements of Rule 404(b), specifically noting that there was not clear and convincing evidence of a prior bad act and that the danger of unfair prejudice outweighs the probative value of the notes. The State concedes that the trial court did not comply with the procedural requirements in Rule 404(b) but argues nevertheless that the court properly admitted the evidence.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." The rationale supporting the rule is that the "admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence." *State v. Gilley*, 297 S.W.3d 739, 757 (Tenn. Crim. App. 2008). However, this evidence *can* be admissible for "other purposes." Tenn. R. Evid. 404(b). Some of these "other purposes" are identified in the Rule's advisory commission comments and include motive, intent, identity, absence of mistake, or a common plan or scheme. *Id.*

Before a trial court may admit evidence of other crimes, wrongs, or acts, Rule 404(b) specifies that the following conditions must be satisfied:

(1)     The court upon request must hold a hearing outside the jury's presence;

(2)     The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3)     The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4)     The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4); *State v. Rimmer*, 623 S.W.3d 235, 261 (Tenn. 2021).

13

### a.    Standard of Appellate Review

Generally, a trial court's decision to exclude or admit evidence will not be disturbed absent an abuse of discretion. *State v. Thacker*, 164 S.W.3d 208, 228 (Tenn. 2005) (citing *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997)). "However, when we consider evidence that implicates Tenn. R. Evid. 404(b), we review the trial court's admissibility ruling de novo unless the trial court substantially complied with the procedures outlined in Rule 404(b)." *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014). If the trial court substantially complied with Rule 404(b), we will overturn the ruling only if the trial court abused its discretion. *See State v. Jarman*, 604 S.W.3d 24, 37 (Tenn. 2020).

The better practice is for the trial court to make express findings so that the record confirms that it substantially complied with the requirements of Rule 404(b). Even where the trial court does not make express findings, though, deference may still be appropriate if it appears that the court made the required findings implicitly. *See State v. Anderson*, No. W2022-00669-CCA-R3-CD, 2023 WL 3019008, at *4 (Tenn. Crim. App. Apr. 20, 2023), *perm. app. denied* (Tenn. Aug. 8, 2023).

In this case, the trial court made an express finding that the notes were relevant to the issue of identity, and it implicitly found that the probative value of the evidence was not outweighed by the danger of unfair prejudice. However, we agree with the State that the record does not clearly show that the trial court implicitly found that the authorship of the notes was supported by clear and convincing evidence as required by Rule 404(b). As such, we review the admission of the notes under a de novo standard of review. *See, e.g.*, *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (finding that trial court's Rule 404(b) ruling is "not entitled to deference" when the court failed "to state on the record whether the prior act was proven by clear and convincing evidence"); *State v. Jackson*, No. M2020-01098-CCA-R3-CD, 2022 WL 1836930, at *27 (Tenn. Crim. App. June 3, 2022) (reviewing the admission of evidence under Rule 404(b) de novo when the trial court "did not explicitly state that the convictions were shown by clear and convincing evidence or explicitly weigh the prejudicial and probative value"), *perm. app. denied* (Tenn. Oct. 19, 2022).

### b.    Identity as a Material Issue

As part of our de novo review, we must first determine whether the jail notes are relevant to a material issue other than conduct conforming to a character trait. "[E]vidence that the defendant committed another crime[, wrong, or act] is admissible only if the ground for relevance is actually being contested in the case on trial." *Bunch v. State*, 605 S.W.2d 227, 230 (Tenn. 1980). Thus, if a defendant places identity at issue and the other evidence does not conclusively eliminate this issue as a jury question, then evidence subject to Rule

404(b) may be admitted to show identity. *State v. Jones*, 450 S.W.3d 866, 892 (Tenn. 2014). The trial court found that the notes were relevant to the issue of identity, and the parties do not contest this finding on appeal.

If the record establishes that the Defendant is the author of the jail notes, then we agree that they are clearly relevant to the contested issue of the Defendant's identity as the perpetrator of the crimes. The notes discuss the facts of the case, attempt to persuade his co-defendant to change his statement, and include other information about court dates and the Defendant's attorney. Moreover, the contents of the notes are relevant to identity because "[a]ny attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred." *State v. Maddox*, 957 S.W.2d 547, 552 (Tenn. Crim. App. 1997) (quoting *Tillery v. State*, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978)); *see also State v. Austin*, 87 S.W.3d 447, 477 (Tenn. 2002) ("Generally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the making of such threats evinces a consciousness of guilt." (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.01 (4th ed. 2000)), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136, 150 (Tenn. 2021).

As such, assuming the Defendant authored the notes, they establish the Defendant's involvement, knowledge, and interest in these offenses and show a consciousness of guilt. We conclude that each note is relevant to the material issue of identity and that this requirement of Rule 404(b) has been established.

### c.     Authorship Established by Clear and Convincing Evidence

Next, we must determine whether clear and convincing evidence shows that the Defendant is the author of each note. *See* Tenn. R. Evid. 404(b)(3). Our supreme court has recognized that "[c]lear and convincing evidence is that which leaves no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Sexton*, 368 S.W.3d at 404. This standard "is more exacting than [a] preponderance of the evidence but less exacting than beyond a reasonable doubt[.]" *State v. Jones*, 450 S.W.3d 866, 893 (Tenn. 2014). It is met when "the evidence offered to show the defendant's involvement in the other [act] is not vague and uncertain." *Id.* (citation and internal quotation marks omitted).

Importantly, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [trial court]." *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Thus, even

15

when conducting a de novo review, we are bound by the credibility determinations made by the trial court unless the preponderance of the evidence is to the contrary. *State v. Adams*, 405 S.W.3d 641, 656 (Tenn. 2013) ("This court reviews a trial court's factual findings, such as credibility and weight afforded to a witness's testimony, under a de novo standard, accompanied by a presumption of correctness unless the evidence preponderates otherwise.").

In this case, two aspects show the Defendant's authorship of the notes. First, the trial court found Mr. Pagou and Mr. Dillard were credible witnesses, at least implicitly, when it decided to admit evidence of the jail notes utilizing only their testimony. Because the record does not preponderate against these findings, we accept them as part of our review. To that end, both Mr. Dillard and Mr. Pagou testified that the notes were from the Defendant. Each testified that he was familiar with the Defendant's handwriting and separately recognized that the notes were in the Defendant's handwriting. Mr. Dillard stated that he was familiar with the Defendant's vernacular and observed that the notes used slang from their gang. Finally, Mr. Dillard and Mr. Pagou identified the Defendant's nickname as "Yai Yoo," and they each remarked that several notes were signed with the Defendant's nickname.

Second, the contents of the letters indicated that the notes were from the Defendant. The notes often use the pronouns "we" and "us," indicating that the author is one of Mr. Pagou's co-defendants. The fourth note specifically named the other two co-defendants in the case and told Mr. Pagou that the author had them under control, indicating by elimination that the Defendant was the author of the note. The second, third, fourth, and fifth notes told Mr. Pagou to change his statement to law enforcement, which was an instruction, if followed, that would benefit the Defendant in his upcoming trial. The fifth note instructed Mr. Pagou to inform the Defendant's attorney that Mr. Pagou is recanting his statement, again suggesting that the Defendant is the author of the notes.

In our review of the record, we have "no serious or substantial doubt" that the Defendant authored the notes. *Sexton*, 368 S.W.3d at 404. In fact, no evidence is to the contrary. As such, we conclude that clear and convincing evidence supports the conclusion that the Defendant authored each of the five jail notes and that this requirement of Rule 404(b) has been established.

### d. Weighing of Probative Value and the Danger of Unfair Prejudice

Finally, we must determine whether the probative value of the jail notes is outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(4). The "final criterion for the trial court to consider during a Rule 404(b) hearing is the probative value

of the other crime evidence versus the danger of unfair prejudice that accompanies the admission of such evidence." *Jones*, 450 S.W.3d at 894 (citing *Sexton*, 368 S.W.3d at 405).

In this case, the jail notes possess significant probative value as to the Defendant's identity as the perpetrator of these offenses. The issue of identity was genuinely contested at trial, and the Defendant's writings directly involved himself in many aspects of the case and revealed a consciousness of guilt.

Balanced against the probative value of the notes, we see little, if any, danger of *unfair* prejudice. Unfair prejudice may exist where there is "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *DuBose*, 953 S.W.2d at 654. In this case, the Defendant principally argues that the balancing tips against admission because the authorship of the notes is in doubt and because they do not involve a confession or other statements directly implicating him in a crime. For the reasons given above, we respectfully disagree. We also note that the Defendant does not otherwise argue that unfair prejudice exists because the Defendant is in jail or that the notes revealed that the Defendant had a propensity or character to commit crimes. *Cf. State v. Barrett*, No. M2010-00444-CCA-R3-CD, 2012 WL 2914119, at *27 (Tenn. Crim. App. July 18, 2012), *perm. app. denied* (Tenn. Dec. 12, 2012). As such, we conclude that the probative value of the notes on the material issue of identity is not outweighed by the danger of unfair prejudice and that this requirement of Rule 404(b) has been established.

In summary, and on our de novo review, we conclude that the trial court properly admitted the jail notes under Rule 404(b). The notes were relevant to the issue of identity, and the Defendant's authorship of the notes was supported by clear and convincing evidence. In addition, the probative value of the notes was significant, and it was not outweighed by what little danger of unfair prejudice existed, if any. The Defendant is not entitled to relief on this issue.

### C.    CONSECUTIVE SENTENCING

Finally, the Defendant challenges the trial court's sentence of life plus fifteen years. He does not take issue with the length of the individual sentences for his crimes. However, he argues that the trial court erred by imposing partially consecutive sentences. He further asserts that consecutive sentencing was "illogical" because the Defendant does not have a prior criminal history and the aggregate length exceeds what is necessary to protect the public. The State responds that the trial court properly exercised its discretion when it imposed partially consecutive sentences. We agree with the State.

When a defendant challenges the trial court's decision to impose consecutive sentences, we review that decision for an abuse of discretion accompanied by a

presumption of reasonableness. *See State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). Thus, we defer to "the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Id.* at 861. As our supreme court has recognized, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862.

The process of imposing discretionary consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b) involves two steps. First, the trial court must find by a preponderance of the evidence that "the defendant qualifies for consecutive sentencing under one of the classifications set forth in section 40-35-115(b)." *State v. Perry*, 656 S.W.3d 116, 127 (Tenn. 2022) (footnote omitted). Second, the trial court must "then choose whether, and to what degree, to impose consecutive sentencing based on the facts and circumstances of the case, bearing in mind the purposes and principles of sentencing." *Id.*

In this case, the trial court found that the Defendant was a dangerous offender and qualified for consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(4). Our supreme court has held that "before imposing consecutive sentences based upon the dangerous offender classification, trial courts must conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)).

To this end, the trial court made several findings supporting consecutive sentences under the dangerous offender category. The trial court first reviewed the Defendant's extensive plan to rob the two victims. It found that the two victims were unarmed and did not provoke the Defendant's actions. It also found that the intentional killing of two people "went above and beyond what was necessary to complete the robbery." As to the second factor, the trial court found that "confinement for [an] extended period of time was necessary to protect society from the [D]efendant's unwillingness to lead a productive life and the [D]efendant's resort to criminal activity" in furtherance of an antisocial lifestyle. The court also noted that, while the Defendant did not have prior convictions, he had fifteen pending cases before the trial court, several of which involved allegations of violence.

From our review, we conclude that the trial court properly considered and weighed the necessary *Wilkerson* factors when imposing consecutive sentences. The trial court made appropriate findings supporting a conclusion that the Defendant's behavior indicated little or no regard for human life and that he had no hesitation about committing a crime in which the risk to human life was high. The court also appropriately considered the violent nature of the offenses involving a double execution without provocation, the presence of

18

multiple victims, the Defendant's planning for his crimes, his use of a weapon, and his social history in finding that the aggregate sentence was reasonably related to the severity of the offenses and that extended confinement was necessary to protect the public from his further criminal conduct. *See, e.g.*, *State v. Watkins*, 648 S.W.3d 235, 276 (Tenn. Crim. App. 2021) (affirming consecutive sentences of life plus twenty-seven years as a dangerous offender when the evidence showed "that Defendant and his codefendants went to the scene armed, that they decided to rob the victim after they were unable to contact Mr. Mitchell, that the victim protested that he did not have anything, that the Defendant nevertheless shot the victim," and fled the scene); *State v. Williams*, No. M2020-01391-CCA-R3-CD, 2021 WL 6066777, at *4 (Tenn. Crim. App. Dec. 22, 2021) (affirming consecutive sentences of life plus thirty-four years as a dangerous offender when "the defendants stood convicted of two execution-style murders which they had committed within a twenty-four-hour period. Clearly, the record supports the trial court's determination that it was necessary to protect the public from the defendants' future criminal actions." (citation and internal quotation marks omitted)), *perm. app. denied* (Tenn. Apr. 13, 2022).

We conclude that the trial court acted within its discretion in imposing consecutive sentences. The Defendant is not entitled to relief on this ground.

## CONCLUSION

In summary, we hold that the evidence was legally sufficient to support the Defendant's convictions for first degree premeditated murder, first degree felony murder, and especially aggravated robbery. We also hold that the jail notes were properly admitted pursuant to Tennessee Rule of Evidence 404(b). Finally, we hold that the trial court acted within its discretion in imposing consecutive sentences. Accordingly, we respectfully affirm the judgments of the trial court.

_____
TOM GREENHOLTZ, JUDGE

19